Fred NELSON

v.

The **CITY OF CRANSTON, By and Through its Treasurer, Col. Vincent McATEER, individually and in his capacity as Chief of Police, and Michael Traficante, individually and in his capacity as Mayor of the City of Cranston.**

No. CIV. A. 97–578ML.

United States District Court, D. Rhode Island.

April 28, 2000.

Edward C. Roy, Jr., Roy & Cook, Providence, RI, for Plaintiff.

William F. Holt, Skolnik, McIntyre & Tate, Providence, RI, Matthew T. Oliverio, Providence, RI, for Defendants.

## MEMORANDUM AND DECISION

LISI, District Judge.

This case is before the Court for decision on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Prior to this writing plaintiff dismissed certain counts of the fourth amended complaint. In the remaining counts plaintiff alleges breach of contract, violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601, 2612–2615, and defamation. Plaintiff also seeks a declaratory judgment. For the following reasons, defendants' motion for summary judgment is granted in part and denied in part.

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational fact finder could render a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." *See National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. *See id.* Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In deciding a motion for summary judgment, this Court's task is to "determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Barreto–Rivera v. Medina–Vargas,* 168 F.3d 42, 45 (1st Cir.1999) (quoting *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. 2505). The Court views all facts and draws all reasonable inferences in a light that is most favorable to the nonmoving party. *See Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 6 (1st Cir.1997).

### II. Facts

In March 1996, plaintiff Fred Nelson ("Nelson") was hired as a dispatcher by the City of Cranston Police Department ("the Cranston Police Department"). The position of dispatcher is governed by a collective bargaining agreement ("CBA") between the National Association of Governmental Employees, Local RI–98 ("NAGE") and the City of Cranston ("the City"). Nelson was a member of NAGE at the time he was employed as a dispatcher and at the time of his termination. According to the terms of the CBA, NAGE is the sole and exclusive representative and bargaining agent of its members with respect to the terms and conditions of employment. The collective bargaining agreement states that "[t]he Employer recognizes the Union as the sole and exclusive bargaining agent for the purpose of establishing salaries, wages, hours of work and other terms and conditions of employment...."

In February 1997, the Cranston Police Department received a citizen complaint alleging that Nelson had been stalking the female complainant, appearing at her home, and otherwise harassing her. Thereafter, the Cranston Police undertook an investigation of Nelson's behavior within the department. On April 14, 1997, Chief of Police, Colonel McAteer ("McAteer") sent a notice to Nelson informing him that the Cranston Police were conducting an internal affairs investigation, and requesting his attendance at a pre-termination hearing.

The pre-termination hearing was held on April 24, 1997. Nelson was present, along with a NAGE representative, NAGE counsel, and his private attorney. At the hearing, Nelson was informed that the Cranston Police Department was considering

his termination due to violations of the Cranston Police Department Policy on Sexual Harassment and the City of Cranston Department of Police Civilian Employees Rules of Conduct. Nelson was terminated on April 28, 1997. Following the termination, NAGE filed a grievance with the City on Nelson's behalf. After the City denied the grievance NAGE requested an arbitration hearing. A hearing was scheduled for November 4, 1997.

On November 4, 1997, prior to the arbitration hearing, NAGE and the City negotiated a settlement agreement. The agreement provides in part:

WHEREAS the City discharged Nelson from employment as a civilian dispatcher for the Cranston Police Department on April 28, 1997 based upon allegations that Nelson perpetrated various acts of sexual harassment directed at female employees . . .

. . . .

NOW THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, and intending to be legally and equitably bound hereby, Nelson, the Union and the City agree as follows. 1. Nelson and the Union shall immediately withdraw, with prejudice, the demand for arbitration . . . and the grievance upon which said demand is based. 2. The City shall rescind Nelson's discharge from employment and convert it to a twenty (20) working day suspension commencing on April 28, 1997. 3. The City shall pay to Nelson the difference between his salary as a police dispatcher less the gross amount of all unemployment compensation he has received since April 28, 1997. The City further agrees to reimburse Nelson the cost of continuing his health and dental coverages . . . through the date of this Memorandum of Agreement. 4. Effective September 12, 1997 through December 15, 1997 Nelson shall be placed on leave without pay status. Nelson is expected to return to his duty as a Cranston Police Dispatcher on December 16, 1997. In the event he fails to do so, regardless of the reason, he will be subject to termination by the City. . . .

. . . .

6. This Memorandum of Agreement is entered into among Nelson, the Union and the City for the purpose of compromising and settling the disputes which are referenced herein, . . . .

Nelson failed to report to work on December 16, 1997. On January 13, 1998, the City sent a notice to Nelson informing him that a second pre-termination hearing was scheduled for January 23, 1998. On January 15, 1998, Nelson's private attorney sent a letter to McAteer claiming a disability under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and requesting leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, 2612–2615. Nelson's attorney enclosed a letter from Dr. Bruce Letourneau, dated January 13, 1998, indicating that Nelson had been diagnosed with acute stress disorder.

The pre-termination hearing was held on January 23, 1998. Nelson was represented at the hearing by NAGE and his private counsel. On January 28, 1998, the City terminated Nelson for failing to report for duty on December 16, 1997. Nelson subsequently brought this action against the City by and through McAteer, and the Mayor of the City of Cranston, Michael Traficante.

### III. Discussion

*A. The Settlement Agreement*

In Count VI of the Complaint plaintiff seeks a declaratory judgment declaring that the November 4, 1997 settlement agreement is void for lack of consideration and for violating both the FMLA, 29 U.S.C. §§ 2601, 2612–2615, and the Rhode Island Parental and Family Leave Act ("PFLA"), R.I. Gen. Laws. §§ 28–48–1 to 28–48–10. In Count VI, plaintiff also seeks damages for alleged breach of the settlement agreement.

### 1. Validity of the settlement agreement

■ Settlement agreements are treated as contracts and enforced under the rules governing contracts generally. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 394 (D.R.I.1998) (citing *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852–53) (1st Cir.1987). A settlement is considered a final judgment for purposes of res judicata. *See Russo v. Baxter Healthcare Corp.*, 919 F.Supp. 565, 568 (D.R.I.1996). "An employee who freely settles [his] demand with the employer may not sue on the same cause of action later merely because [he] grows dissatisfied with the payment for which [he] settled." *Tang v. State of Rhode Island, Dep't. of Elderly Affairs*, 904 F.Supp. 69, 75 (D.R.I.1995).

■ Nelson's assertion that the settlement agreement is void for lack of consideration is incorrect. The terms of the settlement agreement clearly reflect an exchange of legal consideration by the parties. Both parties agreed to withdraw the demand for arbitration. In addition the City agreed to (1) convert Nelson's discharge to a twenty day suspension, (2) pay the difference between his salary less the amount of all unemployment compensation received, (3) reimburse Nelson's health benefit costs, and (4) reinstate Nelson as a dispatcher. Nelson also agreed to return to work on December 16, 1997, or be subject to termination.

■ Nelson's assertion that the settlement agreement is void for violating the FMLA, 29 U.S.C. §§ 2601, 2612–2615, and the PFLA, R.I. Gen. Laws. §§ 28–48–1 to 28–48–10, is also without merit. Nelson argues that the settlement agreement "allowed for the plaintiff's termination while he was disabled and entitled to leave under either or both the [FMLA] and the [PFLA]." There is no basis for this argument in fact or law. First, the PFLA does not provide for the type of leave Nelson sought. *See* R.I. Gen. Laws. § 28–48–2. The PFLA provides for parental and family leave, not sick leave, and therefore it is not applicable to this case. *See id.* The

FMLA, on the other hand, does provide for sick leave, but only to "eligible employee[s]." *See* 29 U.S.C. § 2611(2)(A). As discussed below, Nelson is not an "eligible employee" for purposes of the FMLA. *See infra* Section III.B.1. Since Nelson did not have any rights under either statute, the settlement agreement is not violative of either law.

■ Nelson's remaining arguments regarding the validity of the settlement agreement purport to establish that he is not bound by the agreement. These arguments are also not persuasive. First, Nelson argues that he is not bound by the agreement because he did not sign it. This argument fails because under the terms of the CBA, NAGE is the sole and exclusive representative and bargaining agent of its members with respect to the terms and conditions of employment. Therefore, NAGE was authorized to sign the agreement on Nelson's behalf. Second, Nelson argues that the agreement was subject to the approval of his private attorney. This argument fails because no such condition appears in the agreement.

The Court finds that the settlement agreement is a valid and binding contract which fully resolves the disputes regarding Nelson's discharge. Defendants are entitled to judgment as a matter of law as to plaintiff's request for a declaratory judgment.

### 2. Breach of the settlement agreement

■ The settlement agreement is unclear as to the parties' intent regarding the payments due under the agreement. Nelson argues that defendants breached the settlement agreement by not tendering the back pay and health benefit costs identified in the agreement. Defendants argue that Nelson's obligation to report to work on December 16, 1997, was a condition precedent to their having to make payments to him; citing *Hope Furnace Assocs., Inc. v. FDIC*, 71 F.3d 39, 43 (1st Cir.1995), defendants argue that their duty to perform was discharged when Nelson

failed to report to work on the agreed date.

Taking the facts in the light most favorable to plaintiff, the parties' agreement and their subsequent actions can be reasonably interpreted in the following manner. In exchange for dismissing the arbitration, defendants agreed to convert Nelson's discharge to a suspension and to reimburse his back pay and health benefit costs. Nelson's agreement to return to work on December 16, 1997, or be subject to termination was not explicitly identified as a condition precedent to defendants' obligation to pay him that money. The fact that Nelson did not report to work on the agreed date triggered the termination provision, but did not necessarily discharge the defendants' duty to tender his back pay and health benefit costs.

There remains a genuine issue of material fact as to the parties' intent regarding the payments due under the agreement. As such defendants are not entitled to judgment as a matter of law as to the plaintiff's claim of breach of contract.

## B. Family and Medical Leave Act

In Count IV of the Complaint, Nelson seeks damages and equitable relief pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, 2612–2615. The FMLA provides: "an eligible employee shall be entitled to ... leave ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of [his] position...." 29 U.S.C. §§ 2612(a)(1), 2612(a)(1)(D). An "eligible employee" is one who has been employed "(i) for at least 12 months by the employer with respect to whom leave is requested ...; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

For purposes of the FMLA, the calculation of an employee's "hours of service" is governed by the legal standards established in the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207. See 29

U.S.C. § 2611(2)(C). Under FLSA standards, only hours that are actually worked count towards the FMLA "hours of service" requirement. See 29 U.S.C. § 207(e)(2); Kosakow v. New Rochelle Radiology Assocs., No. 99–CIV. 1635 CM, 2000 WL 279816 at *5 (S.D.N.Y. March 10, 2000). "The FLSA clearly states that 'payments made for occasional periods when no work is performed due to vacation, holiday, illness ... and other similar causes' are not considered compensation for 'hours of employment.'" Robbins v. Bureau of Nat'l Affairs, Inc., 896 F.Supp. 18, 21 (D.D.C.1995)(quoting 29 U.S.C. § 207(e)(2)). Since paid leave is "not considered 'hours of service' within the meaning of 29 U.S.C. § 2611(2)(C) ... it follows logically that unpaid leave should not be considered 'hours of work' as well." Robbins, 896 F.Supp. at 21.

### 1. Nelson's eligibility under the FMLA

In this case, Nelson invoked his rights under the FMLA on January 15, 1998. To qualify as an "eligible employee," Nelson would have to have logged 1250 "hours of service" between January 15, 1997, and January 15, 1998. See 29 U.S.C. § 2611(2)(A).

Neither party provided the Court with the number of hours that Nelson actually worked during the relevant time period. Nelson submitted a year-to-date pay stub dated October 31, 1997, which indicates that he earned $13,215.47 as of that date. Nelson also submitted a sheet which purports to calculate his "hours of service" for 1997. In his affidavit Nelson states that his hourly rate was $13.09, and therefore his year-to-date earnings reflect 1,009 "hours of service" ($13,215.47 ÷ $13.09 per hour = 1,009 hours). The additional computations in Nelson's affidavit do not reflect hours worked and therefore are not "hours of service" as defined by the FMLA and FLSA. See 29 U.S.C. § 2611(2)(A); 29 U.S.C. § 207(e)(2).

Taking the facts in the light most favorable to Nelson, the maximum number

of hours worked during the relevant time period is 1,009. Since Nelson does not meet the "hours of service requirement," he is not an "eligible employee" as defined by the FMLA and FLSA, and he ·is not entitled to the relief he seeks. *See* 29 U.S.C. § 2611(2)(A); 29 U.S.C. § 207(e)(2).

### 2. Nelson's retaliation argument

 Nelson argues that the City's termination on January 28, 1998 was in response to his invocation of the FMLA, and therefore in violation of 29 U.S.C. § 2615(b). This section provides that "[i]t shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to [the FMLA.]" 29 U.S.C. § 2615(b)(1). "To make out a prima facie case of retaliation, [Nelson] must show that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir.1998).

 In this case, Nelson received notice of his pretermination hearing on January 13, 1998, two days prior to requesting leave under the FMLA on January 15, 1998. Since Nelson received his notice before requesting leave, he cannot meet his prima facie case of establishing that his January 28, 1998 termination was prompted by this request. *See Hodgens*, 144 F.3d at 161; *see also Beno v. United Tel. Co. of Fla.*, 969 F.Supp. 723 (M.D.Fla.1997) (employee failed to establish prima facie case of FMLA violation where employer had already undertaken steps toward termination before employee requested medical leave); *Paasch v. City of Safety Harbor*, 915 F.Supp. 315 (M.D.Fla.1995), *aff'd*, 78 F.3d 600 (11th Cir.1996) (municipal employer did not violate FMLA by sending pretermination notice where employee did not make request for leave until after letters were sent).

For these reasons, defendants are entitled to judgment as a matter of law as to Count IV.

### C. Defamation

In Count II of the Complaint, Nelson seeks damages for alleged defamation by defendants McAteer and Traficante. Nelson alleges that the defendants falsely and maliciously accused him of sexually harassing female employees of the Cranston Police, and also caused these false statements to be published. Nelson alleges that the defendants' statements "falsely imputed illegal activity in connection with [Nelson's] employment and [thereby] constitute slander *per se.*"

 In a defamation action, a claimant must prove: " '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher;' and (d) damages, unless the statement is actionable irrespective of special harm." *Swerdlick v. Koch*, 721 A.2d 849, 859–60 (R.I.1998) (quoting *Healey v. New England Newspapers, Inc.*, 555 A.2d 321, 324 (R.I.1989)).

The evidence in this case supporting Nelson's defamation claim is scant. The totality of the evidence relevant to this claim is contained in Nelson's deposition transcript. Therein Nelson testified that he believed the following statements were made about him: "[that] I had stalked [Jane Doe # 1][1]; that I had left messages

---

1. The Court uses the generic name "Jane Doe" to protect the privacy of the alleged

victims of sexual harassment.

on [Jane Doe # 2]'s answering machine continually; that she and [Jane Doe # 3] had told me that they found my behavior bothersome...." Nelson testified that the statements were published to three people outside of the department: two members of the Crime Watch and a colleague of his father named Nancy Bromley. Nelson further testified that the two Crime Watch members heard the statements from a Cranston Police Department dispatcher, and that it was "most likely" Ms. Bromley also learned of the statements "from a fellow dispatcher."

Taking the facts in a light most favorable to the plaintiff, the most that can be drawn from Nelson's testimony in support of his defamation claim is that one or more dispatchers learned about the allegedly defamatory statements and told three members of the public. Nelson does not specifically aver that the defendants communicated the statements to the dispatchers, nor does he aver that the defendants communicated the statements to any of the three members of the public. However, since defendants denied communicating the statements to anyone outside of the department, but they did not deny communicating the statements to the dispatchers, the Court can make the reasonable inference that the defendants told the dispatchers (who then told the three people outside of the department). Nonetheless, Nelson's defamation claim fails because under Rhode Island law, the defendants were privileged to share the information with the dispatchers (and are not responsible for the dispatchers' subsequent communications). *See Ventetuolo v. Burke,* 596 F.2d 476, 484–485 (1st Cir.1979) (citing *Ponticelli v. Mine Safety Appliance Co.,* 104 R.I. 549, 247 A.2d 303 (1968)).

### 1. The "common interest" qualified privilege

■■■ Under Rhode Island law, the "common interest" qualified privilege al-

lowed the defendants to publish the allegedly defamatory statements to Nelson's co-workers. *See Ventetuolo,* 596 F.2d at 476, 484–485 (citing *Ponticelli,* 247 A.2d at 305). In *Ponticelli,* the court defined the privilege as follows:

> It permits a person to escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public.

247 A.2d at 305–06. "The test is whether in order to protect a common interest an employer either correctly or reasonably believes that a plaintiff's co-workers are entitled to be advised of the nature of his misconduct." *Id.* at 307 (citing Restatement (First) of Torts § 596 (1938)).

■■■ In this case, the defendants qualify for the "common interest" privilege because the parties shared an interest in the communication. *See Ponticelli,* 247 A.2d at 306. The common interest was an understanding that employees who engage in sexual harassment will be terminated. *See id.* at 306–07. Disclosure served the defendants' interest by discouraging other dispatchers from engaging in similar behavior and limiting further violation of the department's policy against sexual harassment. *See id.* at 307. In turn, disclosure served the dispatchers' interest by clarifying that if they engaged in sexual harassment they too would be discharged. *See id.* The Court finds that the defendants, in good faith, correctly or reasonably concluded that their interest in enforcing the department's rules and regulations required that they share the reasons for Nelson's discharge with a limited group of co-workers who might thereby be discouraged from engaging in similar practices. *See id.*

*2. Malice*

 The "common interest" qualified privilege does not extend to instances where a defendant's defamatory statements were "induced by malice." *See Ponticelli,* 247 A.2d at 308. It is the defamed person's burden to "show that the primary motivating force for the communication was the publisher's ill will or spite toward him." *Id.* In this case Nelson has not alleged that the primary motivation for the communication to other dispatchers was malice, nor has he proffered any evidence that defendants' actions were primarily motivated by malice. Therefore defendants are entitled to judgment as a matter of law as to Count II.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Counts II and IV are dismissed. Plaintiff's claims for a declaratory judgment in his favor on Count VI is denied. Defendants' motion for summary judgment on plaintiff's damages claim in Count VI is denied.

SO ORDERED.